**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**JACK ANDREW WEBB,**

>   **Plaintiff,**

**v.**                                                 **Civil Action No. 2:11-cv-103**
                                                       **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

>   **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT**
**COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16],**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[18],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.    INTRODUCTION

On December 12, 2011, Plaintiff Jack Andrew Webb ("Plaintiff")[1] filed a Complaint in this

Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner

of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.)  On April 5, 2012, the

Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

answer and the administrative record of the proceedings.  (Answer, ECF No. 12; Administrative

Record, ECF No. 13.)  On May 3, 2012, and June 4, 2012, Plaintiff and the Commissioner filed their

respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 16;

Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 18.)  Following review of the motions by the

---

[1] When Plaintiff filed his Complaint, he was proceeding *pro se*.  However, the Court
notes that Plaintiff is now represented by counsel Eddy Pierre Pierre, Esquire, and Travis M.
Miller, Esquire.  (*See* Docket Sheet, Civil Action No. 2:11-cv-103.)

parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

### A.  *Procedural History*

On April 2, 2009, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on November 7, 2008.[2]  (R. at 94-97, 203-07.)  Both claims were initially denied on June 4, 2009 and again upon reconsideration on July 24, 2009.  (R. at 98-103, 106-11.)  On August 15, 2009, Plaintiff filed a request for a hearing (R. at 87), which was held before United States Administrative Law Judge ("ALJ") Carol A. Baumerich on January 21, 2011.  (R. at 167-71.)  Plaintiff, represented by Ms. Williams, Esquire, appeared and testified by video in Hagerstown, Maryland, while the ALJ sat in Baltimore, Maryland.  (R. at 36, 167.) Diana Sims, an impartial vocational expert, also appeared and testified.  (R. at 36, 191.)  On May 23, 2011, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act").  (R. at 19-28.)  On October 12, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1.)  Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

### B.  *Personal History*

Plaintiff was born on July 26, 1961 and was 47 years old when he filed his DIB and SSI

---

[2] The ALJ's decision lists a date of April 2, 2009 for when Plaintiff filed his applications for DIB and SSI. (R. at 19.)  His applications, contained as Exhibits 1D and 2D in the Administrative Record, both refer to a date of April 27, 2009.  (R. at 203, 205.)  However, the Disability Determination and Transmittal sheets included in the Administrative Record as Exhibits 1A-4A list a filing date of April 2, 2009.  (R. at 94-97.)

applications.  (R. at 203, 205.)  He completed high school (R. at 234) and has prior work experience as an electrician (R. at 230.)  Plaintiff was previously married but was divorced at the time of his applications, and he has no dependent children.  (R. at 203-07.)

## C.    *Relevant Medical History*

### 1.    Relevant Medical History Pre-Dating Alleged Onset Date of November 7, 2008

On January 23, 1991, Plaintiff visited the War Memorial Hospital in Berkeley Springs, West Virginia complaining of severe pain in his lower back that began when he bent over to pick up a pallet at work.  (R. at 346.)  The attending physician noted that Plaintiff had some paralumbar tenderness in the L1-2 area, that he was limited in bending, and that his straight leg raising was positive for pain in his back.  (*Id.*)  The attending physician diagnosed a lower back strain, provided Plaintiff with prescriptions, advised him not to work until released, and instructed him to come back the following Wednesday for a recheck. (*Id.*)  On January 30, 1991, Plaintiff returned for his follow-up appointment, complaining that he still experienced pain when moving and that his back was not much better.  (R. at 349.)  The attending physician noted that Plaintiff had no diminished sensory or motor strength in his lower extremities, but that he still had positive straight leg raising and some limitation of ROM.  (*Id.*)  The attending physician assessed an acute lower back sprain with very little progress, gave Plaintiff prescriptions, and advised him to come back the following week.  (*Id.*)

On February 6, 1991, Plaintiff went back to War Memorial Hospital for his follow-up appointment.  (R. at 334.)  He complained that he was experiencing difficulty in getting up from a sitting position.  (*Id.*)  Dr. Mira McLeod-Birschbach took X-rays of Plaintiff's lumbar spine and noted that the study was "suggestive of mild scoliosis with convexity to the left."  (R. at 335.)  She also noted mild narrowing of the intervertebral spaces at L5-S1.  (*Id.*)  Dr. McLeod-Birschbach

reported that the study showed "[m]inimal straightening of the normal curvatures of the lumbosacral spine" that was "caused by the muscle spasm." (*Id.*) Plaintiff was referred to physical therapy for treatment and was given exercises to complete at home. (R. at 336-38, 344.) On February 11, Plaintiff was advised that he could return to light work with no heavy lifting, but that he not return to a full work load, including heavy lifting, until April 11. (R. at 341, 344.) On February 18, Plaintiff denied any pain, and it was noted that he was ready for discharge from physical therapy. (R. at 341.)

Plaintiff had a study of his lumbar spine done at the War Memorial Hospital on December 9, 2004. (R. at 317.) Dr. Dimitri Misailidis noted that there was "good alignment of the anterior and posterior column." (*Id.*) Overall, he reported a normal study of Plaintiff's lumbar spine. (*Id.*)

On June 3, 2005, Plaintiff presented at the emergency department of the War Memorial Hospital with lower back pain. (R. at 313.) He complained that it was exacerbated by twisting and that nothing relieved it. (R. at 310.) The attending physician noted that Plaintiff had some tenderness to palpation in his lower back, but that he had no muscle spasm, negative straight leg raising, a normal gait, no motor deficits, and a painless ROM. (R. at 311.) After performing a study of Plaintiff's lumbar spine, Dr. Dimitri Misailidis noted a "normal lumbar spine study." (R.aat 312.) The attending physician diagnosed a back spasm, provided Plaintiff with prescriptions, and discharged him home. (R. at 311.) Three weeks later, Plaintiff had an MRI of his lumbar spine taken at War Memorial Hospital. (R. at 308.) Dr. John Blanco noted "[s]mall disk bulges at L4-5 and L5-S1 causing no appreciable canal or neural foraminal compromise." (*Id.*)

On July 31, 2006, Plaintiff presented to the emergency department of the War Memorial Hospital with lower back pain. (R. at 303.) He complained that he was experiencing constant, sharp

pain.  (R. at 301.)  The attending physician noted that Plaintiff had no muscle spasm and a painless ROM.  (R. at 302.)  He also reported that Plaintiff had negative straight leg raising and a normal gait.  (*Id.*)  The attending physician diagnosed acute exacerbation of chronic back pain, provided Plaintiff with prescriptions and instructions to take off work for one week, and discharged him.  (*Id.*)

### 2.  Relevant Medical History Post-Dating Alleged Onset Date of November 7, 2008

On November 8, 2008, Plaintiff visited the Winchester Medical Center with a lumbar strain or spasm.  (R. at 366.)  The doctor noted that Plaintiff had a tender back, muscle spasm, and decreased ROM.  (R. at 368.)  However, Plaintiff did not have any apparent motor defects, and both right and left straight leg raising tests were negative.  (*Id.*)  The doctor assessed an acute lumbar myofascial strain, provided muscle relaxers, and suggested that Plaintiff receive a deep tissue massage.  (*Id.*)

Plaintiff had an MRI of his lumbar spine done at the War Memorial Hospital on November 21, 2008.  (R. at 299.)  Dr. Jong Kim noted a "[l]eft lateral disc bulge at the L5-S1 level with encroachment upon the left L5 nerve root."  (*Id.*)  He also noted a "bulging annulus at the L4-L5 causing no significant abnormality."  (*Id.*)  However, hospital records note that Plaintiff left without being seen.  (R. at 296.)

Plaintiff began physical therapy at Rankin Physical Therapy on January 12, 2009.  (R. at 361.)  At this appointment, Plaintiff noted that the signs and symptoms of his back pain had decreased and rated his pain at a 3-5 out of 10.  (*Id.*)  Erin Stratford, MPT, noted that Plaintiff had a normal gait but experienced pain during lumbar flexion.  (*Id.*)  She also noted that Plaintiff had lower back pain "during seated and supine bilateral straight leg raises."  (*Id.*)  She indicated that Plaintiff would be seen for physical therapy two to three times per week for three to four weeks.  (R.

at 362.)  She also provided a home exercise program to Plaintiff.  (*Id.*)

Plaintiff continued to attend physical therapy during January and early February 2009.  (R. at 360.)  On January 15, January 26, and February 2, MPT Stratford, Holly Peck, PTA, and Misty Carpenter, PTA, noted that Plaintiff "tolerated treatment well."  (*Id.*)  However, on January 22, Plaintiff reported "severe muscle spasms" and presented with an antalgic gait.  (*Id.*)  He continued to report that his back was bothering him on January 26 and February 2.  (*Id.*)  On February 26, 2009, MPT Stratford noted that Plaintiff had not returned to physical therapy since February 2, and she discharged him from physical therapy.  (R. at 358.)

Plaintiff first visited the Virginia Brain and Spine Center on February 16, 2009 for chronic, intermittent lumbar pain.  (R. at 419.)  At this initial appointment, he complained of pain that extended from the right buttock to the posterior thigh.  (*Id.*)  He also described feeling a numbness in his right posterolateral thigh and lateral aspect of the right foot.  (*Id.*)  Plaintiff's right straight leg raise was positive, but his bilateral straight leg raise was negative.  (R. at 420.)  A physical examination also revealed that he had no paraspinous muscle spasm, but he had an antalgic gait.  (*Id.*)  Dr. Lee Selznick assessed lumbar spondylosis without myelopathy.  (*Id.*)  Three days later, Plaintiff received a "right L5-Si and right S1 transforaminal epidural steroid injection," and Dr. Christopher Stalvey noted that he "tolerated the procedure well" and was "able to ambulate without change."  (R. at 422.)  A week later, Plaintiff returned for a pain evaluation, and it was noted that his pain interrupted his sleep and was exacerbated by flexion and lifting.  (R. at 423.)  Plaintiff's demonstrated a negative crossed straight leg raising test, and a physical examination revealed no paraspinous muscle spasm and tenderness.  (R. at 424.)  It was also noted that he had painful, restricted extension, but no pain or restriction on flexion.  (*Id.*)

On March 19, 2009, Plaintiff Visited the Winchester Medical Center with complaints of pain in his right leg. (R. at 364.) He had an MRI of his lumbar spine done. (R. at 365.) Dr. Patrick Ireland noted a "[c]entral to right lateral disc extrusion at the L4-5 level that is migrated inferiorly. This results in a right lateral recess stenosis with potential impingement of the right L5 nerve root." (*Id.*) He also noted "broad-based degenerative disc protrusion" at the L3-4 and L5-S1 without any "spinal stenosis or foraminal stenosis." (*Id.*) A week later, Plaintiff had a follow-up appointment at the Virginia Brain and Spine Center. (R. at 399.) He rated his pain at a 5 out of 10, and PA Kirsten Brondstater noted that Plaintiff's "ability to work is not affected by the pain." (*Id.*) PA Brondstater noted that Plaintiff had back pain, muscle spasms, and an antalgic gait. (R. at 400.) She reviewed Plaintiff's MRI results and scheduled him for a "right L4-5, 5-1" epidural steroid injection with Dr. Stalvey. (*Id.*) She also assessed displacement, lumbar disc without myelopathy and neuritis, lumbosacral. (*Id.*) Two days later, Plaintiff received the "right L5-S1, right L4-5 transforaminal epidural steroid injection" from Dr. Stalvey. (R. at 398.) Dr. Stalvey noted that Plaintiff tolerated the procedure well and denied any new complaints. (*Id.*)

Plaintiff continued to have appointments at the Virginia Brain and Spine Center during April of 2009. (R. at 391-96.) On April 14, 2009, it was again noted that Plaintiff's ability to work was not affected by his pain. (R. at 395.) Plaintiff complained that his Relafen prescription was not reducing his pain, but PA Brondstater also noted that Plaintiff was not taking this prescription consistently. (*Id.*) PA Brondstater noted that Plaintiff had tenderness over his lumbar vertebra and assessed degeneration of the lumbar/lumbosacral disc and lumbago. (R. at 396.) The next day, Plaintiff received a "bilateral L3/4, L4/5, L5/S1 lumbar facet diagnostic nerve blocks." (R. at 394.) Dr. Stalvey assessed lumbar spondylosis without myelopathy and noted that Plaintiff was able to

ambulate without difficulty and had no new complaints after the procedure. (*Id.*) Plaintiff received another one of these procedures on April 29, 2009. (R. at 391-92.) At this appointment, Dr. Stalvey noted that because Plaintiff had received "dramatic pain relief" from these two procedures, he would "offer RF neurotomy in an attempt to provide long lasting pain relief." (R. at 392.)

Plaintiff had a few appointments with the Virginia Brain and Spine Center during May of 2009. (R. at 385-90.) On May 1, 2009, Plaintiff had no new complaints and rated his pain level at a 4 out of 10. (R. at 389.) Dr. Stalvey performed a "right L3/4, L4/5, L5/S1 lumbar facet radiofrequency lesioning" for Plaintiff's lower back pain. (R. at 390.) He noted that Plaintiff denied any new complaints and was able to ambulate without difficulty after the procedure. (*Id.*) Plaintiff received another of these procedures on May 22, 2009, and at this appointment, Plaintiff rated his pain at a 3-4 out of 10. (R. at 387-88.) That same day, Dr. Selznick noted that Plaintiff was "much improved" and "no longer has any right leg symptoms." (R. at 385.) Plaintiff also reported that he only had "mild intermittent low back 'soreness'" and was "interested in getting back to work." (*Id.*)

H. Scovern completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 30, 2009. (R. at 407-14.) He determined that Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, sit, and walk for 6 hours out of an 8-hour workday; and had no limitations in pushing and pulling. (R. at 408.) Dr. Rogelio Lim affirmed this assessment on July 22, 2009. (R. at 418.)

Plaintiff had a few more appointments at the Virginia Brain and Spine Center during 2009. (R. at 426-37.) On July 17, 2009, Plaintiff reported that his lower back was "doing well following the recent lumbar medial branch neurotomies." (R. at 426.) However, Dr. Stalvey assessed him with cervicalgia and noted a decreased cervical ROM and paraspinal musculature tenderness. (*Id.*)

He also noted that Plaintiff had a normal gait and no neurological deficit. (R. at 426-27.) On August 4, 2009, Plaintiff had no complaints, but stated that he wished to apply for permanent disability. (R. at 429.) Dr. Stalvey noted that he would arrange for a disability evaluation with Dr. Kimberly Salata. (*Id.*)

Plaintiff did not return to the Virginia Brain and Spine Center until December 1, 2009. (R. at 431.) At this appointment, he complained of returning lumbar axial pain. (*Id.*) Dr. Stalvey noted that Plaintiff appeared in pain while sitting upright in the examination room, had a normal gait, and had decreased cervical ROM and cervical paraspinous musculature tenderness. (*Id.*) He assessed cervicalgia and lumbar spondylosis without myelopathy, gave Plaintiff prescriptions for naproxen and flexeril, decided on a TENS unit trial, and decided to repeat the lumbar medial branch RF neurotomy. (*Id.*) Plaintiff had a "left L2, L3, L4 medial branch, L5 dorsal ramus radiofrequency lesioning" on December 16, 2009. (R. at 433-34.) Dr. Stalvey noted that Plaintiff did not have any new complaints and was able to ambulate without difficulty after the procedure. (R. at 434.) He also noted that Plaintiff would be fitted for a TENS unit trial that day and that he was also arranging for a "home cerv. traction trial for his chronic cervical complaints." (*Id.*) Plaintiff received another of these procedures on December 30, 2009. (R. at 436-37.)

On January 20, 2010, Plaintiff had an appointment at the Virginia Brain and Spine Center for burning and stabbing pain in his lower lumbar axial spine. (R. at 482.) Dr. Stalvey noted that there was no radiation, numbness, weakness, or trouble walking. (*Id.*) He assessed lumbago. (R. at 483.) Notably, Dr. Stalvey offered physical therapy to Plaintiff, but Plaintiff declined. (*Id.*) A week later, Plaintiff had a follow-up appointment because he continued to experience the pain in his lumbar axial spine. (R. at 484.) He rated the pain at a 7 out of 10 and noted that it was made worse

by movements. (*Id.*) Dr. Stalvey assessed lumbago, continued Plaintiff's prescriptions, and added oxycodone and diazepam to his list of medications. (R. at 485.) He also noted that Plaintiff had paraspinous muscle spasm and tenderness over his lumbar vertebra. (*Id.*)

On February 22, 2010, Plaintiff had an appointment for lower back pain that started to go into his buttocks. (R. at 487.) He stated that it was constant pain and that his right side was worse. (*Id.*) Plaintiff also stated that his Percocet prescription helped the pain "a little," but his Valium prescription just made him sleep. (*Id.*) Rebecca Snyder, PA, noted that Plaintiff was limping and had tenderness over his lumbar vertebra and sacral vertebra. (*Id.*) She assessed degeneration of the lumbar/lumbosacral disc and lumbosacral neuritis. (R. at 488.) PA Snyder continued Plaintiff on Percocet and added baclofen and daypro. (*Id.*) Two days later, Plaintiff had an MRI of his lumbar spine performed by Dr. Patrick Capone. (R. at 489.) Dr. Capone noted an abnormal scan demonstrating: (1) "multi-level degenerative spondylosis with disc bulging from the L1-2 down to the L3-4 level;" (2) "a small right posterior and downward subligamentous disc protrusion which results in no spinal stenosis and no neural foraminal narrowing" at the L4-5 level; (3) "a broad-based disc protrusion with annulus tear resulting in no spinal stenosis and no neural foraminal narrowing" at the L5-S1 level; and (4) "the previously noted disc extrusion at the L4-5 level has significantly decreased in size." (R. at 490.)

Plaintiff returned to the Center on March 4, 2010 for a "right L4/5, L5/S1 transforaminal epidural steroid injection." (R. at 491-92.) Dr. Stalvey noted that Plaintiff tolerated the procedure well, denied any new complaints, and was able to ambulate without change after the procedure. (R. at 492.) On April 19, 2010, Plaintiff had a follow-up appointment for stabbing, shooting, and sharp lower back and right leg pain that was triggered after he sneezed. (R. at 495.) Plaintiff complained

that his right leg pain was more severe, that he felt new numbness, and that it was difficult for him to bear weight on that leg. (*Id.*) PA Snyder noted that Plaintiff had painful flexion and extension, tenderness over his lumbar vertebra, and tenderness over his sacral vertebra. (R. at 496.) She also noted that Plaintiff had a "major gait disturbance." (*Id.*) She assessed lumbosacral neuritis and degeneration of the lumbar/lumbosacral disc and ordered an lumbar MRI to "rule out new herniation." (*Id.*) Two days later, Plaintiff had an MRI of his lumbosacral spine performed by Dr. Capone. (R. at 498-99.) Dr. Capone noted an abnormal scan demonstrating: (1) "a posterior right paracentral disc extrusion with a small herniated disc extending below the posterior longitudinal ligament within the right lateral recess with potential displacement of the arising right L5 nerve root without spinal stenosis" at L4-5; (2) "a mild broad-based degenerative disc bulge with posterior annulus tear resulting in mild foraminal narrowing" at L5-S1; (3) "mild circumferential disc bulging" at L3-4; and (4) "no significant interval change" and "no definite interval change" when compared to the MRI scan of February 24, 2010. (R. at 499.)

On May 4, 2010, Plaintiff returned to the Center for a follow-up appointment for continued lower back and right leg pain. (R. at 503.) Plaintiff stated that he previously had felt that his leg pain was almost gone but that it had returned. (*Id.*) PA Snyder noted that he was "better able to stand and walk today." (*Id.*) She also noted that Plaintiff had painful flexion and extension and tenderness over his lumbar vertebra. (R. at 504.) PA Snyder assessed lumbosacral neuritis. (*Id.*) She offered him a sterapred pack or an epidural steroid injection, but Plaintiff chose to wait and see how much of the pain resolved on its own. (*Id.*) On May 11, 2010, Plaintiff returned to the Center for a "caudal epidural steroid injection." (R. at 505.) He complained of severe lower back pain and spasms that prevented him from straightening his back. (*Id.*) Dr. Stalvey noted that Plaintiff denied

any new complaints and was able to ambulate without change after the procedure.  (*Id.*)  He assessed degeneration of the lumbar/lumbosacral disc.  (R. at 506.)

On August 12, 2010, Drs. Selznick and Stalvey completed a Spinal Impairment Questionnaire of Plaintiff.  (R. at 443-49.)  They opined that Plaintiff was likely to "suffer with chronic painful complaints indefinitely."  (R. at 443.)  In their opinion, Plaintiff could only sit, stand, and walk for up to one hour in an 8-hour work day and would need to get up and move around every 30 minutes.  (R. at 446.)  They also noted that Plaintiff could frequently lift and carry up to 10 pounds; occasionally lift and carry 10-50 pounds; and could never lift and carry over 50 pounds.  (R. at 446-47.)  According to Drs. Selznick and Stalvey, Plaintiff's symptoms and pain would cause frequent interference with concentration and attention.  (R. at 447.)  Furthermore, they stated that Plaintiff would need to take unscheduled breaks lasting for 15 minutes every 30 minutes, and that he would be absent from work because of his condition more than three times per month.  (R. at 448.)  They also thought Plaintiff should avoid all pushing, pulling, kneeling, bending, and stooping.  (R. at 449.)

Plaintiff returned to the Virginia Brain and Spine Center on January 20, 2011.  (R. at 514.)  At this appointment, he complained of "burning, stabbing, shooting, sharp" pain that was an 8 on a 10-point pain scale.  (*Id.*)  Rebecca Snyder, PA, noted that Plaintiff appeared uncomfortable while sitting on a chair in the examination room and frequently changed positions to find a comfortable position.  (*Id.*)  He had an antalgic gait, painful movements, and restriction in extension of his lumbar spine.  (*Id.*)  She assessed lumbar spondylosis without myelopathy, lumbar radiculopathy, and lumbar herniated disc.  (R. at 515.)  She continued medication management because Plaintiff could not afford other interventions because of his lack of insurance.  (*Id.*)

Plaintiff returned to the Virginia Brain and Spine Center on May 24, 2011. (R. at 525-26.) He complained that his pain was a 9 out of 10. (R. at 525.) Dr. Michael Poss assessed lumbar spondylosis without myelopathy and degeneration of the lumbar/lumbosacral disc, and he also performed a "L4/5 interlaminar epidural steroid injection." (R. at 526.) Dr. Poss noted that Plaintiff had no new complains and was able to ambulate without change after the procedure. (*Id.*) On June 13, 2011, Plaintiff called the Center complaining of increased back and right leg pain. (R. at 527.) He complained of numbness and tingling in his leg, and PA Snyder ordered an MRI. (*Id.*) Two days later, Plaintiff had an MRI of his lumbosacral spine. (R. at 523-24.) Dr. Patrick Capone noted an abnormal MRI that demonstrated "[a]t L4-5, there is around 8 mm disc extrusion into the right lateral recess which displaces the right L5root posteriorly and results in right lateral recess stenosis. When compared to the prior MRI from 21 April 2010. The disc extrusion at L4-5 is increased in size." (R. at 524.)

On June 21, 2011, Plaintiff had a follow-up appointment at the Center for "severe recurrent right leg pain." (R. at 528.) He described "disabling pain radiating down the side of his leg to his foot." (*Id.*) Dr. Selznick noted that he was barely able to walk and had to use a cane. (*Id.*) Dr. Selznick assessed lumbar spondylosis without myelopathy, lumbar herniated disc, and lumbar radiculopathy. (*Id.*) He suggested that Plaintiff undergo a right L4-5 discectomy, and Plaintiff agreed. (R. at 529.) On June 27, 2011, at a physical exam, Dr. Selznick noted that Plaintiff had an antalgic gait and a positive right straight leg raise. (R. at 519.) On June 30, 2011, Dr. Selznick performed a lumbar discectomy and nerve root decompression on Plaintiff. (R. at 530.) He noted that Plaintiff was in stable condition after the procedure. (R. at 531.)

### D.    *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified that he had been taking pain medications ever since he started with Dr. Stalvey at the Virginia Brain and Spine Center. (R. at 46.) He also stated that Dr. Stalvey gave him some exercises, such as knee lifts and back stretches, to do at home, and that he tries to do those as much as he can. (R. at 47.)

Plaintiff lives in a mobile home and can drive a car. (R. at 48.) He testified that if he drives for over an hour, he becomes uncomfortable from his back pain. (*Id.*) When he is in the passenger seat of a car, he reclines to try to get comfortable. (R. at 68.) Plaintiff stated that he and his girlfriend traveled to Ocean City, Maryland during the summer of 2010, but he testified that he probably did not drive for more than an hour. (R. at 48-49.) While in Ocean City, he and his girlfriend took about three or four hours to walk the entire length of the boardwalk. (R. at 49.) Plaintiff's girlfriend lives about 45 minutes away in Martinsburg, West Virginia, and he drives to see her about once a week. (R. at 50.) When he sees her, they go out to eat. (*Id.*) They also go to the state park in Berkeley Springs to do activities such as shooting pool. (R. at 51.)

Plaintiff testified that he goes grocery shopping once a week. (R. at 52.) He can go shopping by himself, and he can carry grocery bags into his house and put everything away. (*Id.*) Plaintiff prepares his own meals every night, and cooks things like gumbo, stir fry, and homemade chicken soup. (*Id.*) Plaintiff can dress himself, but has some difficulty because his lower back pain makes it hard for him to bend and to raise his leg. (R. at 53-54.) He can take care of his own housekeeping by vacuuming, taking the trash out, and doing dishes. (R. at 55.) He watches television, but cannot watch an entire movie at one time because he has to get up and move around because of his back. (R. at 55-56.) Plaintiff testified that the heaviest he can lift is forty pounds because he has to lift

forty-pound bags of pellets for his stove. (R. at 58.) He has to carry a bag of pellets for twenty feet daily, and he has to unload the bags from his friend's pickup truck every time that he buys them. (R. at 58-59.) When he unloads them, he has to carry each bag sixteen feet. (R. at 60.)

Plaintiff testified that he has a wood shop at home and he makes some small crafts to sell. (R. at 60.) He makes wishing wells that weigh about eight to ten pounds and lighthouses that weigh about thirty to forty pounds. (R. at 60-61.) He testified that he tries to sell them at craft fairs, such as one in Martinsburg during the summer of 2010. (R. at 61.) To take them to the craft fair, he and his girlfriend had to load them into his pickup truck. (R. at 62.) Plaintiff noted that he made about $400-500 from the sale of these lighthouses and wishing wells in 2010. (R. at 69.)

When asked by the ALJ, Plaintiff testified that he felt he could not work because his back "has a mind of its own" and because when his back hurts, his knees get weak and he has a hard time standing. (R. at 64.) He stated that he experiences back spasms every day, sometimes multiple times per day, and that they do not last very long. (*Id.*) On a "bad day," he does not want to move; instead, he spends those days laying on the couch and not doing chores. (R. at 67.) Plaintiff testified that he has a "bad day" once or twice a week. (*Id.*) He uses a heating pad, ice packs, and a TENS unit for his pain, but stated he did not think the TENS unit worked very well on his pain. (R. at 68.) He testified that he uses a heating pad and ice packs about once a month. (R. at 69.)

### E.    *Vocational Evidence*

Also testifying at the hearing before the ALJ was Diana Sims, an impartial vocational expert. Ms. Sims classified Plaintiff's past work as a journeyman electrician as medium, skilled work. (R. at 71.) She classified his past work as a carpenter as medium, skilled work; however, she indicated that because Plaintiff lifted up to about 100 pounds and 25 pounds frequently, his work as he

performed it would be classified as heavy work. (*Id.*)

The ALJ then posed the following hypotheticals to Ms. Sims:

Q:      He is a younger individual. He's currently 49. He has a 12th grade education plus the journeyman's license. And he has the past relevant work that you've just described for us. Okay. All right. The first hypothetical is at the medium exertion level but there is some other restrictions. The individual must be permitted to sit or stand alternatively at will provided that he's not off task more than 10 percent of the work period. Limited to never climbing ladders, ropes and scaffolds. And limited to frequently climbing ramps and stairs, balancing, stooping, crouching, kneeling, crawling. And must avoid all exposure to unprotected heights and limited to the occasional use of moving machinery. With that hypothetical could he do any of his past work?

A:      No, Your Honor.

Q:      Would there be any other jobs existing in the national economy for someone with the claimant's profile?

A:      Yes, Your Honor.

. . .

A:      I will indicate a medium, unskilled driver helper. And a representative DOT number would 292.667-010. And in the region there would be approximately 1200 jobs, and in the national economy there would be approximately 240,000. I would also indicate--

Q:      By the local region, what region are talking about?

A:      I would be talking about within a 75 mile radius of the Hagerstown area.

. . .

A:      And I would also indicate some but not all medium, unskilled hand packers and a representative DOT number would be 920.587-018. And I'm indicating again as I said not all of those positions because there are some that don't have that flexibility to sit or stand but there are some that are performed in a situation where the person does have more like bench work. And I would indicate that that is not the description necessarily given in the DOT. But based on my knowledge and experience those jobs can be performed in that manner. And I would indicate that in that the region there will be approximately 300 jobs, and in the national economy there will be 150,000.

Q:      So that your testimony regarding the sit stand option is based on your experience as a vocational expert?

A:      That would be correct, Your Honor.

Q:      Okay. Thank you. I'd like to give you another hypothetical. This one is at the light exertion level. Again with a sit stand option allowing the person to sit or stand alternatively at will provided they are not off task more than 10 percent of the work period. Again never climbing ladders, ropes or scaffolds. Limited to frequent is climbing ropes and stairs. And limited to occasional is crawling, kneeling, crouching, stooping, and balancing. And the same–must avoid all exposure to unprotected heights and limited to the occasional use of moving machinery.

A:      Your Honor, I would indicate at the light exertional level, a light unskilled final inspector. And a representative DOT number would be 727.687-054. And in the region there would be approximately 350 jobs, and in the national economy there would be approximately 500,000. And that position is noted as a bench position so therefore there would be the flexibility of sitting and standing. In addition, there's–

Q:      Okay. And that's light, SVP what?

A:      Two.

. . .

A:      And then I have a light SVP 2 bench assembler and a representative DOT number would be 706.684-042. And in the region there would be approximately 150 jobs, and in the national economy there would be approximately 280,000.

. . .

Q:      Okay. Thank you. Okay, so with any of the hypotheticals that I've given you already if I added the additional restriction that work must be limited to unskilled, routine and repetitive, would the same jobs remain with the same numbers?

A:      That would be correct, Your Honor.

Q:      And if I were to add to any of the hypotheticals that I've already given you the additional restriction that work must be allowed off task 20 percent of the work day in addition to regularly scheduled breaks, would there be any jobs

existing in the national economy for someone with the claimant's profile?

A:     I would indicate that if a person had to be off task more than 20 percent of the day that, no, jobs would not exist.

(R. at 71-75.)

Ms. Williams, Plaintiff's attorney at the hearing, then posed the following hypothetical to Ms. Sims:

Q:     Ma'am, based on the client's testimony that he has about two bad days per week and from his treating physicians, Doctor Salvey and Doctor Selznick who have opined at exhibit 14F, that he would miss more than three times per month–miss more than three times of work per month, would he still be employable based on those limitations, the days missed?

A:     I would indicate no because with that criteria it would less than the requirements in charge of competitive work which we normally we look at if a person is missing more than 12 to 15 days per year, it would not be consistent with competitive employment.

(R. at 76.)

A Report of Contact form dated June 2, 2009 determined that Plaintiff could not perform his past work as an electrician as he performed it. (R. at 253.) However, it noted that Plaintiff could perform work as an electrician as it is described in the national economy. (*Id.*)

## F.     *Lifestyle Evidence*

Plaintiff completed an Adult Function Report on May 3, 2009. (R. at 244-51.) At that time, Plaintiff reported that he lives alone and spend a typical day doing dishes, playing Solitaire, and watching television. (R. at 244.) He takes care of a pet by providing it with food and water, and his girlfriend helps him care for the pet. (R. at 245.) Plaintiff stated that his conditions cause him to have to move "careful and slow in all activities." (*Id.*)

Plaintiff reported that he prepares his own meals daily, and that preparing meals takes him

ten to thirty minutes.  (R. at 246.)  He prepares sandwiches, frozen dinners, and multiple-course

meals.  (*Id.*)  He does the dishes every day and does laundry every week.  (*Id.*)  Plaintiff does not

do yard work because it involves too much bending over and because he does not want to strain his

back by lifting too much.  (R. at 247.)  He can drive a car and go out alone.  (*Id.*)  Plaintiff shops

whenever he needs something.  (*Id.*)  He can pay bills, count change, handle a savings account, and

use a checkbook and money orders.  (*Id.*)

Plaintiff enjoys woodworking and crafts, but stated that he had not done those hobbies lately.

(R. at 248.)  He spends time with others doing various things.  (*Id.*)  Plaintiff regularly goes to town

to shop for weekly groceries, and he does not need reminders to go places.  (*Id.*)  Overall, Plaintiff

reported that he does not get out as much as he used to.  (R. at 249.)

## G.    *Other Evidence*

On April 12, 2010, Dr. Christopher Stalvey of the Virginia Brain and Spine Center wrote a

letter regarding his treatment of Plaintiff.  (R. at 440.)  In this letter, Dr. Stalvey noted that he had

treated Plaintiff's lower back pain with medication, interventional pain procedures, and non-invasive

therapies, such as a TENS unit.  (*Id.*)  However, Dr. Stalvey stated that because of Plaintiff's "self-

reported limited ability to sit or stand for prolonged periods of time because of lumbar axial pain,

it is unlikely that he would tolerate even sedentary work."  (*Id.*)

On September 28, 2010, Dr. Stalvey wrote another letter regarding his treatment of Plaintiff.

(R. at 508.)  In this letter, Dr. Stalvey opined that Plaintiff would not make much progress because

of the "chronic nature and failure of conservative care to date."  (*Id.*)  He also thought that Plaintiff's

symptoms would likely last for more than 12 months and "prevent him from performing full-time,

competitive work."  (*Id.*)  Dr. Selznick agreed with this assessment.  (*Id.*)

### III.  CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts the following assignments of error:

- The ALJ failed to follow the treating physician rule; and

- The ALJ improperly evaluated Plaintiff's credibility.

(Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8-16, ECF No. 17.)  Plaintiff

asks that the Court reverse the Commissioner's decision and remand the case for the calculation of

benefits or, in the alternative, reverse the decision and remand the case for a new hearing and

decision.  (*Id.* at 16.)

The Commissioner, in his motion for summary judgment, asserts that the ALJ's decision is

"supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.)

Specifically, Defendant asserts that:

- Substantial evidence supports the ALJ's credibility determination; and

- The ALJ properly evaluated Dr. Stalvey's opinion.

(Def.'s Br. Supp. Mot. for Summ. J. ("Def.'s Br."), ECF No. 19 at 9-15.)

### IV.  STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . ."); 
> *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v.
> Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial
> evidence" means "such relevant evidence as a reasonable person might accept as
> adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct.
> at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,
> 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the

> case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d
> 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to
> determine the weight of the evidence, nor is it the court's function to substitute its
> judgment . . . if the decision is supported by substantial evidence. *See Laws v.*
> *Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial

evidence as "evidence which a reasoning mind would accept as sufficient to support a particular

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's

conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability

determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore,

**"the language of § 205(g) . . . requires that the court uphold the decision even should the court**

**disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v.*

*Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. ANALYSIS

### A. *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or whether he would
> be hired if he applied for work . . . . "[W]ork which exists in the national economy"
> means work which exists in significant numbers either in the region where such
> individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled

at any of the five steps, the process does not proceed to the next step. *Id.*

**B.**      ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the

following findings:

> **1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.**

> **2.      The claimant has not engaged in substantial gainful activity since November 7, 2008, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).**

3. The claimant has the following severe impairment: Lumbar degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant must be allowed to sit or stand alternatively, at will, provided that he is not off task more than 10 percent of the work period. He can never climb ladders, ropes or scaffolds. He can frequently climb ramps or stairs. He can occasionally balance, stoop, crouch, kneel and crawl. He can occasionally use moving machinery. He must avoid all exposure to unprotected heights.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 26, 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 7, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 21-28.)

*C.*     *Analysis of the Administrative Law Judge's Decision*

**1.     The ALJ Properly Followed the Treating Physician Rule**

As his first assignment of error, Plaintiff asserts that the ALJ failed to follow the treating physician rule. (Pl.'s Mem. at 8.) Specifically, Plaintiff argues that the ALJ's conclusion that Dr. Stalvey's opinions were based on Plaintiff's subjective complaints rather than medical findings is contradicted by the record and that the ALJ erred by relying on the state agency residual functional capacity assessments in determining that Plaintiff was not disabled. (*Id.* at 9-11.) Furthermore, Plaintiff opines that the ALJ erred by concluding that Dr. Stalvey's assessments could be rejected because they were on issues reserved to the Commissioner. (*Id.* at 12.) However, the undersigned finds that Plaintiff's argument is without merit.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never ben entitled to controlling

weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. **This explanation may be brief.**

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each

one).

As an initial matter, the portions of Dr. Stalvey's opinions stating that Plaintiff is "unlikely . . . to tolerate even sedentary work" (R. at 440) and cannot "perform[] full-time, competitive work" (R. at 508) are not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Morgan v. Barnhart*, 142 F. App'x, 716, 722 (4th Cir. 2005) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value). Because these portions of Dr. Stalvey's opinions are not medical evidence, the ALJ properly did not assign controlling weight to his opinions on these issues.

Furthermore, Dr. Stalvey's opinions are contradicted by other substantial evidence in the record. Particularly, the ALJ observed that Dr. Stalvey's medical opinions were contradicted by Plaintiff's own testimony regarding his daily activities. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (permitting an ALJ to consider whether the medical opinion is "inconsistent with the other substantial evidence in your case record"); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003)) (determining that an ALJ may weigh other factors brought to his or her attention that tend to support or contradict a treating physician's opinion). In an adult function report dated May 3, 2009, Plaintiff reported that he has not done "much of anything" since November of 2008. (R. at 244.) However, later in that report, he stated that he does dishes, does laundry, cooks, goes shopping, and enjoys woodworking and crafts. (R. at 246-248.) Moreover, at the hearing before the ALJ on January 21, 2011, Plaintiff testified that he and his girlfriend traveled to Ocean City, Maryland and that he travels forty-five minutes to Martinsburg, West Virginia at least once a week to visit his girlfriend. (R. at 48-50.) Plaintiff also testified that he visits Berkeley Springs State Park a few times per year. (R. at 51-52.)

He has to carry a forty-pound bag of pellets daily for his pellet stove. (R. at 58.) Finally, Plaintiff testified that he has a wood shop at home in which he makes lawn ornaments such as wishing wells and lighthouses to sell. (R. at 60-63.) These daily activities are inconsistent with Dr. Stalvey's opinion that Plaintiff cannot tolerate even sedentary work or perform full-time work because of his "worsening low back symptoms" and "failure of conservative care." (R. at 440, 508); *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time . . . .").

Moreover, the ALJ properly rejected Dr. Stalvey's opinions because they contradicted his own records. On April 12, 2010, Dr. Stalvey noted that Plaintiff was "unlikely" to "tolerate even sedentary work" because of his "self-reported limited ability to sit or stand for prolonged periods of time because of lumbar axial pain." (R. at 440.) *See Craig*, 76 F.3d at 590 n.2 (noting that the fact that a medical provider memorializes a patient's subjective complaints in medical records does not transform the complaints into objective medical findings). Furthermore, four months later, on August 12, 2010, Dr. Stalvey completed a Spinal Impairment Questionnaire in which he noted that Plaintiff could occasionally lift and carry between ten to fifty pounds. (R. at 446-47.) This notation is inconsistent with Dr. Stalvey's opinion that Plaintiff could not perform even sedentary work because sedentary work involves lifting no more than ten pounds at a time. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a).

Dr. Stalvey's opinions also contradict other medical evidence contained in the administrative record. As noted in her opinion, the ALJ considered the opinions of the State agency consultants to be "persuasive to the extent they support a finding of 'not disabled.'" (R. at 26.) Medical consultant H. Scovern noted that Plaintiff was not disabled and that it was reasonable to expect that

he would be able to conduct "at least full medium work."  (R. at 414.)  Dr. Rogelio Lim affirmed

this opinion.  (R. at 418.)  State agency consultants are "highly qualified" and "experts in Social

Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

In his brief, Plaintiff alleges that the ALJ erroneously relied on the assessment completed

by H. Scovern because there is no indication that H. Scovern "is a physician or that any other non-

examining physician gave an opinion."  (Pl.'s Mem. at 10.)  According to Plaintiff, the

Administration has "adopted the position that [non-physician state agency] sources cannot be relied

on as medical evidence.  (*Id.* (alteration in original); *see also id.*, Ex. A ("Mem. from Acting Assoc.

Chief ALJ Costello").)  However, Plaintiff has misread this memorandum from Acting Chief ALJ

Costello.  According to this memorandum, ALJs "must not consider SDM [Single Decisionmaker]

RFC assessment forms and other findings as opinion evidence and must not evaluate them in their

decisions."  (Mem. from Acting Assoc. Chief ALJ Costello (alteration in original).)  However, they

must "continue to consider findings made by State agency MCs [medical consultants] and PCs

[psychological consultants] as opinion evidence and weigh that evidence together with other

evidence in the record when they make their decisions."  (*Id.* (alterations in original).)  Here, H.

Scovern marked that he is a State agency medical consultant.  (R. at 414.)  Therefore, the ALJ

properly considered his physical residual capacity assessment of Plaintiff as medical opinion

evidence.  *See* 20 C.F.R. §§ 404.1527(f), 416.927(f); *see also* SSR 96-6p, 1996 WL 374180, at *2

(noting that ALJs are not bound by the findings of State agency physicians and psychologists, "but

they may not ignore these opinions and must explain the weight given to the opinions in their

decisions").  Overall, the ALJ's decision to adopt the opinions of the State agency consultants to the

extent that they determined Plaintiff was not disabled is consistent with SSR 96-6p.  When

conflicting evidence is presented in the administrative record, the ALJ has the discretion to resolve these inconsistencies. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Here, the ALJ resolved the inconsistencies and determined that Dr. Stalvey's opinions were only entitled to minimal weight because they contradicted his own treatment notes, the State agency medical evidence, and Plaintiff's own testimony regarding his daily activities.

Plaintiff cites *Chapman v. Astrue*, No. 07-CV-2868, 2010 WL 419923, at *9 (D.S.C. Jan. 29, 2010) and *Ausburne v. Barnhart*, No. 04-CV-78, 2005 WL 1862642, at *3 (W.D. Va. Aug. 1, 2005) to support his argument that his daily activities are neither consistent with a capacity to work full-time nor contradict Dr. Stalvey's findings. (Pl.'s Mem. at 10.) He suggests that courts in the Fourth Circuit have downplayed the significance of a claimant's ability to perform some daily activities when considering the capacity to work full-time. (*Id.*) "Daily activities must be vocationally relevant in that they must reveal an ability to perform work-related activity within the constraints and demands of the workplace." *Ausburne*, 2005 WL 1862642, at *3 (citing *Miller v. Bowen*, No. 88-1715, 877 F.2d 60, 1989 WL 64121, at *5 (4th Cir. 1989). However, this authority does not support the proposition that the ALJ must downplay the significance of daily activities or is prohibited from considering them when determining whether a claimant is disabled. *See Howard v. Astrue*, No. 3:09-CV-820, 2010 WL 3909906, at *3 (E.D. Va. Sept. 24, 2010). As discussed above, the ALJ not only considered Plaintiff's daily activities, but also inconsistencies between Dr. Stalvey's opinions and the record when countering Dr. Stalvey's opinions that Plaintiff was disabled.

While household activities and daily activities to care for oneself should not be considered substantial gainful activity, *see Day v. Barnhart*, No. 5:04CV00092, 2005 WL 1639091, at *3 (W.D.

Va. July 13, 2005), the record suggests that Plaintiff is not disabled from working, and the ALJ assigned proper weight to Dr. Stalvey's opinion. Not only do Plaintiff's daily activities involve lifting forty-pound bags of pellets and engaging in woodworking to make lighthouses and wishing wells to sell and therefore contradict Dr. Stalvey's findings on Plaintiff's limitations, Dr. Stalvey's opinions contradict those of the State agency assessments and his own treatment notes. Therefore, the undersigned finds that the ALJ assigned proper weight to the opinions of Plaintiff's treating physician.

### 2. The ALJ Properly Evaluated Plaintiff's Credibility

As his second assignment of error, Plaintiff asserts that the ALJ failed to properly evaluate his credibility. (Pl.'s Mem. at 12.) Specifically, Plaintiff argues that the ALJ applied the wrong legal standard, and that she failed to detail how his conservative treatment conflicted with his limitations. (*Id.* at 14-15.) Furthermore, Plaintiff alleges that his work history entitles him to a finding of substantial credibility and that the ALJ's finding that Plaintiff's daily activities are equivalent to full-time light work activity is inappropriate. (*Id.* at 15-16.) However, the undersigned finds that Plaintiff's argument is without merit.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. *Craig*, 76 F.3d at 594; *see also Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. *Craig*,

76 F.3d at 594; *Hines*, 453 F.3d at 565. Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

At a minimum, the Social Security Act requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374,186, at *2. "Because he had the opportunity to observe the demeanor and to

determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." *Ryan v. Astrue*, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Sencindiver v. Astrue*, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Neither Plaintiff nor Defendant dispute the ALJ's determination that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms." (R. at 23.) Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms. *See Craig*, 76 F.3d at 585. In fact, the ALJ explicitly mentioned evidence pertaining to Plaintiff's daily activities:

> In evaluating the persuasiveness of the claimant's testimony, the undersigned notes significant inconsistencies between the claimant's allegations and the evidence of record. At the hearing, the claimant testified to performing daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. For example, the claimant testified that he lives alone in a mobile home. He reported independence in maintaining his residence, performing household chores and handling his household finances. Furthermore, the claimant testified he goes grocery shopping at least once per week. He said he is able to carry his groceries into his house, as well as unpack and put them away without any assistance. Although he reported some difficulties getting dressed, he indicated he is independent in performing personal care and grooming. The claimant also testified that he is able to lift about 40 pounds. He explained that his home is heated with a pellet stove. He stated he travels to the local store and purchases about 5 tons of pellets in 40-pound bags, at least once per month during the winter. He and a friend then unload these 40-pound bags of pellets at his home and carry each bag, approximately 16 feet to a storage area. The claimant says he retrieves one 40-pound

bag of pellet each day for use in his home.

In his function report dated May 3, 2009, the claimant indicated his day consists of washing dishes, playing solitaire and watching television (Exhibit 4E/1). He reported taking care of a pet, which he provided with food and water (Exhibit 4E/2). He reported he was able to prepare simple meals daily and do laundry (Exhibit 4E/3). He indicated that he traveled by walking, driving or riding in a car and could travel alone (Exhibit 4E/4). The claimant's ability to participate in such activities undermines his credibility regarding the severity of the disabling functional limitations alleged.

Despite allegations of disabling symptoms and limitations precluding employment, the claimant testified to going on vacation since the alleged onset date. According the claimant, he vacationed in Ocean City, Maryland along with his girlfriend, during the summer of 2010. He explained that this trip entailed a 3-4 hour drive each way. While in Ocean City, the claimant said both eh and his girlfriend walked the entire length of the boardwalk, for approximately 3-4 hours. Furthermore, the claimant testified to taking short tips [sic] to Berkeley Springs State Park for picnics and shooting pool. He stated he goes to the Berkeley Springs State Park about 3-4 times per year and his last trip occurred Thanksgiving Day 2010. Claimant also reported that he drives 45 minutes to Martinsburg, West Virginia, at least once per week, to visit with his girlfriend. Thus, the claimant's ability to go on vacation and engage in other mini excursions suggests that his alleged symptoms may have been overstated.

In addition, as previously mentioned, the record reflects work activity after the alleged onset date. At the hearing, the claimant testified he operates a small business making and selling wishing wells weighing about 8-10 pounds and lighthouses weighing about 30-40 pounds. He reported that he and his girlfriend load the ornaments onto his S10 pickup truck. He stated he personally transported these lawn ornaments to the flea market in Martinsburg and to a garage sale in Berkeley Springs. He recalled selling approximately 6 wishing wells and 3 or 4 lighthouses in 2010. Although this work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have been somewhat greater than the claimant has generally reported.

(R. at 25-26.) Despite Plaintiff's assertion that the ALJ's consideration of his daily activities was insufficient to determine his ability to work (Pl.'s Br. at 15-16), the ALJ appropriately examined Plaintiff's complaints as related to his daily activities. *See* 20 C.F.R. §§ 1529(c)(3), 416.929(c)(3); *see also Mastro v. Apfel*, 270 F.3d 171, 179-80 (4th Cir. 2000) (finding that the ALJ properly

considered the plaintiff's daily activities in concluding that she could perform past relevant work); *Smith v. Astrue*, No. 2:11-CV-32, 2010 WL 1435661, at \*7 (N.D. W. Va. Apr. 24, 2012) (finding "no error in the ALJ's consideration of the plaintiff's daily activities").

The ALJ also discussed treatment that Plaintiff has received to relieve his lower back pain. Specifically, the ALJ noted that while Plaintiff "has received treatment for his lower back impairment, that treatment has been essentially routine and/or conservative in nature." (R. at 23.) The ALJ further stated that Plaintiff's treatment regimen consisted of "pain medication and steroid injections," and that the record indicated that he had significantly improved by May 2009. (R. at 24.) Finally, the ALJ noted that Plaintiff's treating physicians have recommended that he proceed with conservative treatment and have noted that "his condition has stabilized accordingly." (R. at 25.) In his brief, Plaintiff argues that his treatment, consisting of steroid injections, is hardly conservative treatment. (Pl.'s Br. at 14-15.) However, many courts in the Fourth Circuit have classified steroid injections as conservative treatment. *See, e.g., Doak v. Astrue*, No. 4:11-CV-116-WW, 2010 WL 1432454, at \*3 (E.D.N.C. Apr. 25, 2012); *French v. Astrue*, 2:11CV00026, 2012 WL 1099838, at \*1 (W.D. Va. Apr. 2, 2012); *Martin v. Barnhart*, No. 5:10CV00102, 2012 WL 663168, at \*5 (W.D. Va. Feb. 29, 2012); *Jones v. Astrue*, No. 5:11-CV-174-FL, 2012 WL 1555901, at \*6 (E.D.N.C. Feb. 27, 2012); *Reel v. Astrue*, No. 2:09-CV-99, 2010 WL 2365667, at \*14 (N.D. W. Va. Mar. 2, 2010); *see also Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.") Given this, the ALJ appropriately considered Plaintiff's treatment when determining that Plaintiff was not entirely credible.

The ALJ also discussed medical and non-medical evidence which is inconsistent with

Plaintiff's subjective complaints, including:

- After an examination at Winchester Medical Center on November 8, 2008, Plaintiff "jumped off the stretcher" with only mild palpation. (R. at 23.) At this appointment, treating personnel also recommended a deep tissue massage as part of his treatment; however, Plaintiff became "confrontational and verbally abusive toward the medical staff" at this suggestion. (*Id.*)

- On November 21, 2008, Plaintiff visited the Morgan County War Memorial Hospital with complaints of lumbar pain; however, he left without being seen. (R. at 23-24.)

- At Plaintiff's first appointment at the Virginia Brain and Spine Center on February 16, 2009, Plaintiff described "daily sharp pain radiating down to his right buttock and leg," but also noted that he did not require any pain medication for this pain. (R. at 24.)

- While Plaintiff had an initial positive straight leg raising test, his subsequent tests were negative. (R. at 24.)

- On February 25, 2009, Plaintiff reported that he was still able to perform normal activities of daily living as long as they involved lifting under 10 pounds. (R. at 24.)

- By May 2009, the record indicates that Plaintiff had "significantly improved," and a treatment note dated May 22, 2009 noted that Plaintiff "was no longer experiencing right leg pain, his back pain was described as mild and intermittent, and surgery was deemed unnecessary." (R. at 24.)

- Although Plaintiff complained of a resurgence in his lower back pain after engaging in heavy lifting in January 2010, he did not complain about "difficulties with radiation, numbness, weakness, or trouble walking." (R. at 24.)

- An MRI of Plaintiff's lumbar spine done in February 2010 showed that Plaintiff's disc extrusion at L4-5 had significantly decreased in size when compared with the MRI from March 2009. (R. at 24.) An MRI done in April 2010 "showed no significant interval change." (R. at 25.)

- Notes from Plaintiff's treatment dated May 4, 2010 reveal that Plaintiff reported that his leg pain was almost gone and that his ability to stand and walk was much improved. (R. at 25.)

In his brief, Plaintiff suggests that he is entitled to an enhanced credibility determination because of his "honorable work history with earnings every year prior to his disability since 1978." (Pl.'s Br. at 15.) However, Plaintiff's work history does not automatically entitle his subjective complaints to entitled credibility. *See Jeffries v. Astrue*, No. 3:10-cv-1405, 2012 WL 314156, at *25 (S.D. W. Va. Feb. 1, 2012) (noting that the plaintiff relied on cases from outside the Fourth Circuit to support his argument that he was entitled to substantial credibility because of his work history and further noting that the "requirement that the ALJ make a credibility determination based on these factors would be meaningless if a long work history *standing alone* established 'substantial credibility'"). Furthermore, Plaintiff cites *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) for the proposition that the ALJ's "boilerplate" language in her credibility determination is insufficient. (Pl.'s Br. at 14.) However, as discussed above, the ALJ provided reasons for discrediting Plaintiff's complaints and cited the evidence to support this determination. Although the ALJ may have used a "template" to draft her decision, the substance of the decision itself supports the credibility determination. *See Smith*, 2012 WL 1435661, at *6 (noting that the ALJ's findings could not be classified as "boilerplate language" because the ALJ spent three pages discussing evidence supporting his credibility finding).

After considering the evidence, the ALJ determined that Plaintiff's complaints are not credible in light of the medical evidence, treatment received by Plaintiff, and his daily activities. (R. at 25-26.) Specifically, the ALJ noted that Plaintiff's "ability to participate in such activities undermines his credibility regarding the severity of the disabling functional limitations alleged." (R. at 25.) Furthermore, Plaintiff's work history did not automatically entitle him to a finding of enhanced credibility by the ALJ. *See Jeffries*, 2012 WL 314156, at *25. Because the ALJ adequately supported his credibility determination with evidence from Plaintiff's own statements, as well as objective findings from the record, the undersigned finds that substantial evidence supports the ALJ's credibility determination.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 16) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 18) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such

Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **21st** day of **June, 2012**.



DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE