**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**


**JACK ANDREW WEBB,**

       Plaintiff,

**v.**                                     **Civil Action No. 2:11-CV-00103
(BAILEY)**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.


## ORDER ADOPTING REPORT AND RECOMMENDATION

On this day, the above-styled matter came before the Court for consideration of the Report and Recommendation ("R&R") of United States Magistrate Judge David J. Joel [Doc. 20], Plaintiff's Objections thereto [Doc. 21], and the Defendant's Response to Plaintiff's Objections [Doc. 23]. Pending before the Court is a Motion for Summary Judgment [Doc. 16] filed by Jack Andrew Webb ("Plaintiff"), along with a Motion for Summary Judgment [Doc. 18] filed by the Commissioner of Social Security ("the Commissioner").

Having reviewed the record and considered the arguments of the parties, this Court finds that the Commissioner's Motion for Summary Judgment should be **GRANTED**, and Plaintiff's Motion for Summary Judgment should be **DENIED**. Accordingly, this Court **ADOPTS** the R&R.

1

# I.  BACKGROUND

## A. Procedural History

On April 2, 2009, Plaintiff filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on November 7, 2008 [Doc. 20 at 2].  Both claims were initially denied on June 4, 2009, and again upon reconsideration on July 24, 2009 [*Id.*].  On August 15, 2009, Plaintiff  filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Carol A. Baumerich on January 21, 2011.  Plaintiff appeared and testified by video in Hagerstown, Maryland while the ALJ sat in Baltimore, Maryland [*Id.*].  On May 23, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA") [*Id.*].  On October 12, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner [*Id.*].  Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

## B. Plaintiff's Personal History

Plaintiff was born July 26, 1961, and was 47 years old when he filed his DIB and SSI applications [*Id.* at 2-3].  He completed high school and has prior work experience as an electrician [*Id.* at 3].  Plaintiff was previously married but was divorced at the time of his applications, and he has no dependent children [*Id.*].

## C. Plaintiff's Relevant Medical History

### 1. Relevant Medical History Pre-Dating Alleged Onset Date of November 7, 2008

On January 23, 1991, Plaintiff visited the War Memorial Hospital ("WMH") in Berkeley Springs, West Virginia complaining of severe pain in his lower back that began

when he bent over to pick up a pallet at work [*Id.*].  The attending physician noted that Plaintiff had some paralumbar tenderness in the L1-2 area, that he was limited in bending, and that his straight leg raising was positive for pain in his back [*Id.*].  The attending physician diagnosed a lower back strain, provided Plaintiff with prescriptions, advised him not to work until released, and instructed him to come back the following Wednesday for a recheck [*Id.*].  Plaintiff returned for his follow-up appointment, complaining that he still experienced pain when moving and that his back was not much better [*Id.*].  The attending physician noted that Plaintiff had no diminished sensory or motor strength in his lower extremities, but that he still had positive straight leg raising and some limitation of range of motion ("ROM") [*Id.*].  The attending physician assessed an acute lower back sprain with very little progress, gave Plaintiff prescriptions, and advised him to come back the following week [*Id.*].

On February 6, 1991, Plaintiff went back to WMH for his follow-up appointment, and complained that he was experiencing difficulty in getting up from a sitting position [*Id.*].  Dr. Mira McLeod-Birschbach took X-rays of Plaintiff's lumbar spine and noted that the study was "suggestive of mild scoliosis with convexity to the left" [*Id.*].  She also noted mild narrowing of the intervertebral spaces at L5-SI [*Id.*].  The doctor reported that the study showed "[m]inimal straightening of the normal curvatures of the lumbosacral spine" that was "caused by the muscle spasm" [*Id.* at 4].  Plaintiff was referred to physical therapy for treatment and was given exercises to complete at home [*Id.*].  On February 11, Plaintiff was advised that he could return to light work with no heavy lifting, but that he not return to a full work load, including heavy lifting, until April 11 [*Id.*].  On February 18, Plaintiff denied any pain, and it was noted that he was ready for discharge from physical therapy [*Id.*].

Plaintiff had a study of his lumbar spine done at WMH on December 9, 2004, during which Dr. Dimitri Misailidos noted that there was "good alignment of the anterior and posterior column" [*Id.*]. Overall, he reported a normal study of Plaintiff's lumbar spine [*Id.*].

On June 3, 2005, Plaintiff presented at the emergency department of WMH with lower back pain and complained that it was exacerbated by twisting and that nothing relieved it [*Id.*]. The attending physician noted that Plaintiff had some tenderness to palpation in his lower back, but that he had no muscle spasm, negative straight leg raising, a normal gait, no motor deficits, and a painless ROM [*Id.*]. After performing a study of Plaintiff's lumbar spine, Dr. Misailidis noted a "normal lumbar spine study" [*Id.*]. The attending physician diagnosed a back spasm, provided Plaintiff with prescriptions, and discharged him home [*Id.*]. Three weeks later, Plaintiff had an MRI of his lumbar spine taken at WMH, during which Dr. John Blanco noted "[s]mall disk bulges at L4-5 and L5-SI causing no appreciable canal or neural foraminal compromise" [*Id.*].

On June 31, 2006, Plaintiff presented to the emergency department of WMH with lower back pain, complaining that he was experiencing constant, sharp pain [*Id.* at 4-5]. The attending physician noted that Plaintiff had no muscle spasm and a painless ROM and also reported that Plaintiff had negative straight leg raising and a normal gait [*Id.* at 5]. The attending physician diagnosed acute exacerbation of chronic back pain, provided Plaintiff with prescriptions and instructions to take off work for one week, and discharged him [*Id.*].

### 2. Relevant Medical History POST-Dating Alleged Onset Date of November 7, 2008

On November 8, 2008, Plaintiff visited the Winchester Medical Center with a lumbar strain or spasm [*Id.*]. The doctor noted that Plaintiff had a tender back, muscle spasm, and

decreased ROM, but Plaintiff did not have any apparent motor defects, and both right and left straight leg raising tests were negative [*Id.*].  The doctor assessed an acute lumbar myofascial strain, provided muscle relaxers, and suggested that Plaintiff receive a deep tissue massage [*Id.*].

Plaintiff had an MRI of his lumbar spine done at the War Memorial Hospital on November 21, 2008, during which Dr. Jong Kim noted a "[l]eft lateral disc bulge at the L5-S1 level with encroachment upon the left L5 nerve root" [*Id.*].  He also noted a "bulging annulus at the L4-L5 causing no significant abnormality" [*Id.*].  However, hospital records note that Plaintiff left without being seen [*Id.*].

Plaintiff began physical therapy at Rankin Physical Therapy on January 12, 2009 [*Id.*].  At this appointment, Plaintiff noted that the signs and symptoms of his back pain had decreased and rated his pain a 3-5 out of 10 [*Id.*].  Erin Stafford, MPT, noted that Plaintiff had a normal gait but experienced pain during lumbar flexion [*Id.*].  She also noted that Plaintiff had lower back pain "during seated and supine bilateral straight leg raises" [*Id.*].  She indicated that Plaintiff would be seen for physical therapy two to three times per week for three to four weeks and also provided a home exercise program to Plaintiff [*Id.* at 5-6].

Plaintiff continued to attend physical therapy during January and early February 2009 [*Id.* at 6].  On January 15, January 26, and February 2, MPT Stratford, Holly Peck, PTA, and Misty Carpenter, PTA, noted that Plaintiff "tolerated treatment well" [*Id.*].  However, on January 22, Plaintiff reported "severe muscle spasms" and presented with an antalgic gait [*Id.*].  He continued to report that his back was bothering him on January 26 and February 2 and on February 26, 2009, MPT Stratford noted that Plaintiff had not returned to physical therapy since February 2, and she discharged him from physical

5

therapy [*Id.*].

Plaintiff first visited the Virginia Brain and Spine Center ("VBSC") on February 16, 2009, for chronic, intermittent lumbar pain [*Id.*]. At his initial appointment, he complained of pain that extended from the right buttock to the posterior thigh and described feeling a numbness in his right posterolateral thigh and lateral aspect of the right foot [*Id.*]. Plaintiff's right straight left raise was positive, but his bilateral straight leg raise was negative [*Id.*]. A physical examination also revealed that he had no paraspinous muscle spasm, but he had an antalgic gait [*Id.*]. Dr. Lee Selznick assessed lumbar spondylosis without myelopathy [*Id.*]. Three days later, plaintiff received a "right L5-S1 and right S1 transforaminal epidural steroid injection," and Dr. Christopher Stalvey noted that he "tolerated the procedure well" and was "able to ambulate without change" [*Id.*]. A week later, Plaintiff returned for a pain evaluation, and it was noted that his pain interrupted his sleep and was exacerbated by flexion and lifting [*Id.*]. Plaintiff demonstrated a negative crossed straight leg raising test, and a physical examination revealed no paraspinous muscle spasm and tenderness [*Id.*]. It was also noted that he had painful, restricted extension, but no pain or restriction on flexion [*Id.*].

On March 19, 2009, Plaintiff visited Winchester Medical Center with complaints of pain in his right leg [*Id.* at 7]. He had an MRI of his lumbar spine done and Dr. Patrick Ireland noted a "[c]entral to right lateral disc extrusion at the L4-5 level that is migrated inferiorly. This results in a right lateral recess stenosis with potential impingement of the right L5 nerve root" [*Id.*]. He also noted "broad-based degenerative disc protrusion" at the L3-4 and L5-S1 without any "spinal stenosis or foraminal stenosis" [*Id.*]. A week later, Plaintiff had a follow-up appointment at the VBSC [*Id.*]. He rated his pain at a 5 out of 10,

and PA Kirsten Brondstater noted that Plaintiff had back pain, muscle spasms, and an antalgic gait [*Id.*]. She assessed displacement, lumbar disc without myelopathy, and neuritis, lumbosacral, and also reviewed Plaintiff's MRI results and scheduled him for a "right L4-5, 5-1" epidural steroid injection with Dr. Stalvey [*Id.*]. Two days later, Plaintiff received the epidural steroid injection from Dr. Stalvey, who noted that Plaintiff tolerated the procedure well and denied any new complaints [*Id.*].

Plaintiff continued to have appointments at the VBSC during April of 2009 [*Id.*]. On April 14, 2009, it was noted that Plaintiff's ability to work was not affected by his pain [*Id.*]. Plaintiff complained that his Relafen prescription was not reducing his pain, but PA Brondstater also noted that Plaintiff was not taking his prescription consistently [*Id.*]. PA Brondstater also noted that Plaintiff had tenderness over his lumbar vertebra and assessed degeneration of the lumber/lumbosacral disk and lumbago [*Id.*]. The next day, Plaintiff received a "bilateral L3/4, L4/5, L5/S1 lumbar facet diagnostic nerve blocks" [*Id.*]. Dr. Stalvey assessed lumbar spondylosis without myelopathy and noted that Plaintiff was able to ambulate without difficulty and had no new complaints after the procedure [*Id.* at 7-8]. Plaintiff received another one of these procedures on April 29, 2009, and during this appointment, Dr. Stalvey noted that because Plaintiff had received "dramatic pain relief" from these two procedures, he would "offer RF neurotomy in an attempt to provide long lasting pain relief" [*Id.* at 8].

Plaintiff had a few appointments with the VBSC during May of 2009, and on May 1, 2009, Plaintiff had no new complaints and rated his pain level at a 4 out of 10 [*Id.*]. Dr. Stalvey performed a "right L3/4, L4/5, L5/S1 lumbar facet radiofrequency lesioning" for Plaintiff's lower back pain and noted that Plaintiff denied any new complaints and was able

to ambulate without difficulty after the procedure [*Id.*].  Plaintiff received another one of these procedures on May 22, 2009, and at this appointment, Plaintiff rated his pain at a 3-4 out of 10 [*Id.*].  That same day, Dr. Selznick noted that Plaintiff was "much improved" and "no longer has any right leg symptoms" [*Id.*].  Plaintiff also reported that he only had "mild intermittent low back 'soreness'" and was "interested in getting back to work" [*Id.*].

Henry Scovern, M.D. completed a Physical Residual Functioning Capacity Assessment of Plaintiff on May 30, 2009, and determined that Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, sit, and walk for 6 hours out of an 8-hour workday; and had no limitations in pushing and pulling [*Id.*].  Dr. Rogelio Lim affirmed this assessment on July 22, 2009 [*Id.*].

Plaintiff had a few more appointments at the VBSC during 2009, and on July 17, 2009, Plaintiff reported that his lower back was "doing well following the recent lumbar medial branch neurotomies" [*Id.*].  However, Dr. Stalvey assessed him with cervicalgia and noted a decreased cervical ROM and paraspinal musculature tenderness [*Id.*].  He also noted that Plaintiff had a normal gait and no neurological deficit [*Id.* at 9].  On August 4, 2009, Plaintiff had no complaints, but stated that he wished to apply for permanent disability [*Id.*].  Dr. Stalvey noted that he would arrange for a disability evaluation with Dr. Kimberly Salata [*Id.*].

Plaintiff did not return to the VBSC until December 1, 2009 [*Id.*].  At this appointment, he complained of returning lumbar axial pain [*Id.*].  Dr. Stalvey noted that Plaintiff appeared in pain while sitting upright in the examination room, had a normal gait, and had decreased cervical ROM and cervical paraspinous musculature tenderness [*Id.*].  He assessed cervicalgia and lumbar spondylosis without myelopathy, gave Plaintiff prescriptions for

8

naproxen and flexeril, decided on a TENS unit trial, and decided to repeat the lumbar medial branch RF neurotomy [*Id.*]. Plaintiff had a "left L2, L3, L4 medial branch, L5 dorsal ramus radiofrequency lesioning" on December 16, 2009 [*Id.*]. Dr. Stalvey noted that Plaintiff did not have any new complaints and was able to ambulate without difficulty after the procedure [*Id.*]. He also noted that Plaintiff would be fitted for a TENS unit trial that day and that he was also arranging for a "home cerv. traction trial for his chronic cervical complaints" [*Id.*]. Plaintiff received another of these procedures on December 30, 2009 [*Id.*].

On January 20, 2010, Plaintiff had an appointment at the VBSC for burning and stabbing pain in his lower lumbar axial spine [*Id.*]. Dr. Stalvey noted that there was no radiation, numbness, weakness, or trouble walking and assessed lumbago [*Id.*]. Notably, Dr. Stalvey offered physical therapy to Plaintiff, but Plaintiff declined [*Id.*]. A week later, Plaintiff had a follow-up appointment because he continued to experience the pain in his lumbar axial spine [*Id.*]. He rated the pain a 7 out of 10 and noted that it was made worse by movements [*Id.* at 9-10]. Dr. Stalvey assessed lumbago, continued Plaintiff's prescriptions, and added oxycodone and diazepam to his list of medications [*Id.* at 10]. He also noted that Plaintiff had paraspinous muscle spasm and tenderness over his lumbar vertebra [*Id.*].

On February 22, 2010, Plaintiff had an appointment for lower back pain that started to go into his buttocks [*Id.*]. He stated that it was constant pain and that his right side was worse [*Id.*]. Plaintiff also stated that his Percocet prescription helped the pain "a little," but his Valium prescription just made him sleep [*Id.*]. Rebecca Snyder, PA, noted that Plaintiff was limping and had tenderness over his lumbar vertebra and sacral vertebra [*Id.*]. She

assessed degeneration of the lumbar/lumbosacral disc and lumbosacral neuritis [*Id.*].  PA Snyder continued Plaintiff on Percocet and added baclofen and daypro [*Id.*].  Two days later, Plaintiff had an MRI of his lumbar spine performed by Dr. Patrick Capone, who noted an abnormal scan demonstrating: (1) "multi-level degenerative spondylosis with disc bulging from the L1-2 down to the L3-4 level;" (2) "a small right posterior and downward subligamentous disc protrusion which results in no spinal stenosis and no neural foraminal narrowing" at the L4-5 level; (3) "a broad-based disc protrustion with annulus tear resulting in no spinal stenosis and no neural foraminal narrowing" at the L5-S1 level; and (4) "the previously noted disc extrusion at the L4-5 level has significantly decreased in size" [*Id.*].

Plaintiff returned to the VBSC on March 4, 2010, for a "right L4/5, L5/S1 transforaminal epidural steroid injection" [*Id.*].  Dr. Stalvey noted that Plaintiff tolerated the procedure well, denied any new complaints, and was able to ambulate without change after the procedure [*Id.*].  On April 19, 2010, Plaintiff had a follow-up appointment for stabbing, shooting, and sharp lower back and right leg paid that was triggered after he sneezed [*Id.*].  Plaintiff complained that his right leg pain was more severe, that he felt new numbness, and that it was difficult for him to bear weight on that leg [*Id.* at 10-11].  PA Snyder noted that Plaintiff had painful flexion and extension, tenderness over his lumbar vertebra, and tenderness over his sacral vertebra [*Id.* at 11].  She also noted that Plaintiff had a "major gait disturbance" [*Id.*].  She assessed lumbosacral neuritis and degeneration of the lumbar/lumbosacral disc and ordered a lumbar MRI to "rule out new herniation" [*Id.*].  Two days later, Plaintiff had an MRI of his lumbosacral spine performed by Dr. Capone, who noted an abnormal scan demonstrating: (1) "a posterior right paracentral disc extrusion with a small herniated disc extending below the posterior longitudinal ligament within the right

10

lateral recess with potential displacement of the arising right L5 nerve root without spinal stenosis" at L4-5; (2) "a mild broad-based degenerative disc bulge with posterior annulus tear resulting in mild foraminal narrowing" at L5-S1; (3) "mild circumfrential disc bulging" at L3-4; and (4) "no significant interval change" and "no definite interval change" when compared to the MRI scan of February 24, 2010 [*Id.*].

On May 4, 2010, Plaintiff returned to the VBSC for a follow-up appointment for continued lower back and right leg pain [*Id.*]. Plaintiff stated that he had previously felt that his leg pain was almost gone but that it had returned [*Id.*]. PA Snyder noted that he was "better able to stand and walk today," and also noted that Plaintiff had painful flexion and extension and tenderness over his lumbar vertebra [*Id.*]. PA Snyder assessed lumbosacral neuritis and offered Plaintiff a sterapred pack or an epidural steroid injection, but Plaintiff chose to wait and see how much of the pain resolved on its own [*Id.*]. On May 11, 2010, Plaintiff returned to the VBSC for a "caudal epidural steroid injection, complaining of severe lower back pain and spasms that prevented him from straightening his back [*Id.*]. Dr. Stalvey noted that Plaintiff denied any new complaints and was able to ambulate without change after the procedure [*Id.* at 11-12]. He assessed degeneration of the lumbar/lumbosacral disc [*Id.* at 11].

On August 12, 2010, Drs. Selznick and Stalvey completed a Spinal Impairment Questionnaire of Plaintiff [*Id.*]. They opined that Plaintiff was likely to "suffer with chronic painful complaints indefinitely" [*Id.*]. In their opinion, Plaintiff could only sit, stand, and walk for up to one hour in an 8-hour work day and would need to get up and move around every 30 minutes [*Id.*]. The also noted that Plaintiff could frequently lift and carry up to 10 pounds; occasionally lift and carry 10-50 pounds; and could never lift and carry over 50

pounds [*Id.*]. According to Drs. Selznick and Stalvey, Plaintiff's symptoms and pain would cause frequent interference with concentration and attention [*Id.*]. Furthermore, they stated that Plaintiff would need to take unscheduled breaks lasting for 15 minutes every 30 minutes, and that he would be absent from work because of his condition more than three times per month [*Id.*]. They also thought Plaintiff should avoid all pushing, pulling, kneeling, bending, and stooping [*Id.*].

Plaintiff returned to the VBSC on January 20, 2011, and complained of "burning, stabbing, shooting, sharp" pain that was an 8 on a 10-point pain scale [*Id.*]. Rebecca Snyder, PA, noted that Plaintiff appeared uncomfortable while sitting on a chair in the examination room and frequently changed positions to find a comfortable position [*Id.*]. He had an antalgic gait, painful movements, and restriction in extension of his lumbar spine [*Id.*]. She assessed lumbar spondylosis without myelopathy, lumbar radiculopathy, and lumbar herniated disc [*Id.*]. She continued medication management because Plaintiff could not afford other interventions because of his lack of insurance [*Id.*].

Plaintiff returned to the VBSC on May 24, 2011, and complained that his pain was a 9 out of 10 [*Id.* at 13]. Dr. Michael Poss assessed lumbar spondylosis without myelopathy and degeneration of the lumbar/lumbosacral disc, and he also performed a "L4/5 interlaminar epidural steroid injection" [*Id.*]. Dr. Poss noted that Plaintiff had no new complaints and was able to ambulate without change after the procedure [*Id.*]. On June 13, 2011, Plaintiff called the VBSC complaining of increased back and right leg pain as well as numbness and tingling in his leg [*Id.*]. PA Snyder ordered an MRI and two days later, Plaintiff had an MRI of his lumbosacral spine [*Id.*]. Dr. Patrick Capone noted an abnormal MRI that demonstrated "[a]t L4-5, there is around 8mm disc extrusion into the right lateral

recess which displaces the right L5 root posteriorly and results in right lateral recess stenosis. When compared to the prior MRI from 21 April 2010, the disc extrusion at L4-5 is increased in size" [*Id.*].

On June 21, 2011, Plaintiff had a follow-up appointment at the VBSC for "severe recurrent right leg pain" and described "disabling pain radiating down the side of his leg to his foot" [*Id.*]. Dr. Selznick noted that he was barely able to walk and had to use a cane [*Id.*]. Dr. Selznick assessed lumbar spondylosis without myelopathy, lumbar herniated disc, and lumbar radiculopathy [*Id.*]. He suggested that Plaintiff undergo a right L4-5 discectomy, and Plaintiff agreed [*Id.*]. On June 27, 2011, at a physical exam, Dr. Selznick noted that Plaintiff had an antalgic gait and a positive straight leg raise [*Id.*]. On June 30, 2011, Dr. Selznick performed a lumbar discectomy and nerve root decompression on Plaintiff [*Id.*]. He noted that Plaintiff was in stable condition after the procedure [*Id.*].

### D. Testimonial Evidence

At the hearing before the ALJ, Plaintiff testified that he had been taking pain medications ever since he started with Dr. Stalvey at the VBSC [*Id.* at 14]. He also stated that Dr. Stalvey gave him some exercises, such as knee lifts and back stretches to do at home and that he tries to do those as much as he can [*Id.*].

Plaintiff lives in a mobile home and can drive a car, but testified that if he drives for over an hour, he becomes uncomfortable from his back pain [*Id.*]. When he is in the passenger seat of a car, he reclines to try to get comfortable [*Id.*]. Plaintiff stated that he and his girlfriend traveled to Ocean City, Maryland during the summer of 2010, but he testified that he probably did not drive for more than an hour [*Id.*]. While in Ocean City, he and his girlfriend took about three or four hours to walk the entire length of the boardwalk

[*Id.*].  Plaintiff's girlfriend lives about 45 minutes away in Martinsburg, West Virginia, and he drives to see her about once a week [*Id.*].  When he sees her, they go out to eat [*Id.*].  They also go to the state park in Berkeley Springs to do activities such as shooting pool [*Id.*].

Plaintiff testified that he goes grocery shopping once a week [*Id.*].  He can go shopping by himself, and he can carry grocery bags into his house and put everything away [*Id.*].  Plaintiff prepares his own meals every night, and cooks things like gumbo, stir fry, and homemade chicken soup [*Id.*].  Plaintiff can dress himself, but has some difficulty because his lower back pain makes it hard for him to bend and raise his leg [*Id.*].  He can take care of his own housekeeping by vacuuming, taking the trash out, and doing dishes [*Id.*].  He watches television, but cannot watch an entire movie at one time because he has to get up and move around because of his back [*Id.*].  Plaintiff testified that the heaviest he can lift is forty pounds because he has to lift forty-pound bags of pellets for his stove [*Id.* at 14-15].  He has to carry a bag of pellets for twenty feet daily, and he has to unload the bags from his friend's pickup truck every time that he buys them [*Id.* at 15].  When he unloads them, he has to carry each bag sixteen feet [*Id.*].

Plaintiff testified that he has a wood shop at home and he makes some small crafts to sell [*Id.*].  He makes wishing wells that weigh about eight to ten pounds and lighthouses that weigh about thirty to forty pounds [*Id.*].  He testified that he tries to sell them at craft fairs, such as one in Martinsburg during the summer of 2010 [*Id.*].  To take them to the craft fair, he and his girlfriend have to load them into his pickup truck [*Id.*].  Plaintiff noted that he made about $400-500 from the sale of these lighthouses and wishing wells in 2010 [*Id.*].

When asked by the ALJ, Plaintiff testified that he felt he could not work because his

14

back "has a mind of its own" and because when his back hurts, his knees get weak and he has a hard time standing [*Id.*].  He stated that he experiences back spasms every day, sometimes multiple times per day, and that they do not last very long [*Id.*].  On a "bad day," he does not want to move; instead, he spends those days laying on the couch and not doing chores [*Id.*].  Plaintiff testified that he has a "bad day" once or twice a week [*Id.*].  He uses a heating pad, ice packs, and a TENS unit for his pain, but stated he did not think the TENS unit worked very well on his pain [*Id.*].  He testified that he uses a heating pad and ice packs about once a month [*Id.*].

### E. Vocational Evidence

Also testifying at the hearing before the ALJ was Diana Sims, a vocational expert [*Id.*].  Ms. Sims classified Plaintiff's past work as a journeyman electrician as medium, skilled work [*Id.*].  She classified his past work as a carpenter as medium, skilled work; however, she indicated that because Plaintiff lifted up to about 100 pounds and 25 pounds frequently, his work as he performed it would be classified as heavy work [*Id.* at 15-16].  The ALJ then posed a set of hypotheticals to Ms. Sims, which can be found in pages 71 through 76 of the Record.  A Report of Contact form dated June 2, 2009, determined that Plaintiff could not perform his past work as an electrician as he performed it [*Id.* at 18].  However, it noted that Plaintiff could perform work as an electrician as it is described in the national economy [*Id.*].

### F. Lifestyle Evidence

Plaintiff completed an Adult Function Report on May 3, 2009 [*Id.*].  At that time,

Plaintiff reported that he lives alone and spends a typical day doing dishes, playing Solitaire, and watching television [*Id.*]. He takes care of a pet by providing it with food and water, and his girlfriend helps him care for the pet [*Id.*]. Plaintiff stated that his conditions cause him to have to move "careful and slow in all activities" [*Id.*]. Plaintiff reported that he prepares his own meals daily, and that preparing meals takes him ten to thirty minutes [*Id.* at 18-19]. He prepares sandwiches, frozen dinner, and multiple-course meals [*Id.* at 19]. He does the dishes every day and does laundry every week [*Id.*]. Plaintiff does not do yard work because it involves too much bending over and because he does not want to strain his back by lifting too much [*Id.*]. He can drive a car and go out alone as well as shop whenever he needs something [*Id.*]. He can pay bills, count change, handle a savings account, and use a checkbook and money orders [*Id.*].

Plaintiff enjoys woodworking and crafts, but stated that he had not done those hobbies lately [*Id.*]. He spends time with others doing various things and regularly goes to town to shop for weekly groceries [*Id.*]. He does not need reminders to go places [*Id.*]. Overall, Plaintiff reported that he does not get out as much as he used to [*Id.*].

### G. Other Evidence

On April 12, 2010, Dr. Stalvey of the VBSC wrote a letter regarding his treatment of Plaintiff [*Id.*]. In this letter, Dr. Stalvey noted the he had treated Plaintiff's lower back pain with medication, interventional pain procedures, and non-invasive therapies, such as a TENS unit [*Id.*]. However, Dr. Stalvey stated that because of Plaintiff's "self-reported limited ability to sit or stand for prolonged periods of time because of lumbar axial pain, it is unlikely that he would tolerate even sedentary work" [*Id.*].

16

On September 28, 2010, Dr. Stalvey wrote another letter regarding his treatment of Plaintiff [*Id.*]. In this letter, Dr. Stalvey opined that Plaintiff would not make much progress because of the "chronic nature and failure of conservative care to date" [*Id.*]. He also thought that Plaintiff's symptoms would likely last for more than 12 months and "prevent him from performing full-time, competitive work" [*Id.*]. Dr. Selznick agreed with this assessment [*Id.*].

## II. APPLICABLE STANDARDS OF REVIEW

### A. Judicial Review of an ALJ Decision

"Judicial review of a final decision regarding disability benefits is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g). 'The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive.' **Richard v. Perales**, 402 U.S. 389, 390 (1971); **Coffman v. Bowen**, 829 F.2d 514, 517 (4th Cir. 1987). The phrase 'supported by substantial evidence' means 'such relevant evidence as a reasonable person might accept as adequate to support a conclusion.' *See* **Perales**, 402 U.S. at 401, 91 S.Ct. at 1427 (citing **Consolidated Edison Co. v. NLRB**, 305 U.S. 197, 229 (1938)). Substantial evidence . . . consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance . . .. Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See* **Laws v. Celebrezze**, 368 F.2d 640, 642 (4th Cir. 1966); **Snyder v. Ribicoff**, 307 F.2d 518, 529 (4th Cir. 1962).

Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. ***King v. Califano***, 599 F.2d 597, 599 (4th Cir. 1979). 'This Court does not find facts or try the case *de novo* when reviewing disability determinations.' ***Seacrist v. Weinberger***, 538 F.2d 1054, 1056-57 (4th Cir. 1976)." ***Hays v. Sullivan***, 907 F.2d 1453, 1456 (4th Cir. 1990).

### B. Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act ("SSA"), a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . ..[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

| | |
|---|---|
| Step One: | Determine whether the claimant is engaging in substantial gainful activity; |
| Step Two: | Determine whether the claimant has a severe impairment; |
| Step Three: | Determine whether the claimant has a listed impairment (20 C.F.R. Part 404, Subpart P, Appendix 1); |

In between Step Three and Step Four, the ALJ conducts an analysis of the claimant's credibility regarding subjective complaints of pain and assesses the claimant's Residual Functional Capacity ("RFC").

Step Four:    Consider the RFC assessment to determine whether the claimant can perform past relevant work; and

Step Five:    Consider the RFC assessment, age, education, and work experience to determine whether the claimant can perform any other work.

See 20 C.F.R. § 404.1520 (2012). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

### III. ANALYSIS

### A. Plaintiff's Objections

Plaintiff challenges the recommendation of Magistrate Judge Joel to reject his claims of error regarding the ALJ's rejection of the opinions from treating physician, Dr. Stalvey, as inconsistent with Plaintiff's activities of daily living [Doc. 20 at 26]. Plaintiff also challenges Magistrate Judge Joel's conclusion that the ALJ properly rejected Plaintiff's credibility based on his activities of daily living [Doc. 20 at 32-33]. Additionally, Plaintiff objects that the ALJ improperly relied upon the opinion of state agency medical consultant Henry Scovern, M.D. because Plaintiff could find no information on his credentials [Doc. 21 at 5-7]. As such, this Court will conduct a *de novo* review of these claims in turn.

### B. Discussion of the ALJ's Decision

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the SSA through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since November 7, 2008, the alleged onset date.

3. The claimant has the following severe impairment: Lumbar degenerative disc disease.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functioning capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant must be allowed to sit or stand alternatively, at will, provided that he is not off task more than 10 percent of the work period. He can never climb ladders, ropes, or scaffolds. He can frequently climb ramps or stairs. He can occasionally balance, stoop, crouch, kneel, and crawl. He can occasionally use moving machinery. He must avoid all exposure to unprotected heights.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 26, 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the SSA, from November 7, 2008 through the date of this decision.

[Doc. 20 at 22-23].

### C. Analysis of the ALJ's Decision

#### *1. The ALJ Properly Followed the Treating Physician Rule*

The opinion of a treating physician will be given controlling weight if the opinion is (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also* **Hines v. Barnhart**, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting **Hunter v. Sullivan**, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"); **Craig v. Chater**, 76 F.3d 585, 590 (4th Cir. 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *5.

When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* The following factors are used to determine

the weight given to the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the degree of specialization of the physician; and (6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

This Court agrees with the decision of the ALJ not to assign controlling weight to Dr. Stalvey's opinions stating that Plaintiff is "unlikely . . . to tolerate even sedentary work" and cannot "perform full-time, competitive work" [Doc. 20 at 19]. These portions of Dr. Stalvey's opinions are, in fact, legal conclusions and do not constitute medical evidence. ***Morgan v. Barnhart***, 142 Fed. App'x 716, 722 (4th Cir. 2005) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value). As such, Dr. Stalvey's opinions on these issues are not entitled to controlling weight.

Furthermore, Dr. Stalvey's opinions are contradicted by other substantial evidence in the record. Plaintiff testified that he does dishes, does laundry, cooks, goes shopping, engages in woodworking and crafts, travels once a week to visit his girlfriend, and visits Berkeley Springs State Park a few times a year. Plaintiff also testifies that he carries a forty-pound bag of pellets daily and has a wood shop at home where he makes lawn ornaments to sell. This Court agrees that these daily activities are directly inconsistent with Dr. Stalvey's opinion that Plaintiff cannot tolerate even sedentary work or perform full-time work because of his "worsening low back symptoms" and "failure of conservative care"

[Doc. 20 at 19]. See also 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time . . ..").

Moreover, this Court finds that the ALJ properly rejected Dr. Stalvey's opinions because they not only contradicted his own records, but they also contradicted medical evidence contained in the administrative record. On April 12, 2010, Dr. Stalvey noted that Plaintiff was "unlikely" to "tolerate even sedentary work" because of his "self-reported limited ability to sit or stand for prolonged periods of time because of lumbar axial pain" [Doc. 20 at 19]. Four months later, Dr. Stalvey completed a Spinal Impairment Questionnaire in which he noted that Plaintiff could occasionally lift and carry ten to fifty pounds [Doc. 20 at 12]. This notation is indeed inconsistent with Dr. Stalvey's opinion that Plaintiff could not perform even sedentary work because sedentary work involves lifting no more than ten pounds at a time. 20 C.F.R. §§ 404.1567(a), 416.967(a).

Additionally, State agency consultants are "highly qualified" and "experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(I). As noted in their opinion, the ALJ considered the opinions of State agency consultants to be "persuasive to the extent they support a finding of 'not disabled.'" Medical consultant Henry Scovern, M.D., noted that Plaintiff was not disabled and that is was reasonable to expect that he would be able to conduct "at least full medium work" [Doc. 20 at 8]. Dr. Rogelio Lim affirmed this opinion [*Id.*]. This Court agrees with the ALJ's determination that Dr. Stalvey's opinions were only entitled to minimal weight because they contradicted (1) his own treatment notes, (2) the State agency medical evidence, and (3) Plaintiff's own testimony regarding his daily activities.

It is undisputed that Plaintiff has back pain. In this Court's opinion, however, the

23

record shows that Plaintiff is not disabled from working. Plaintiff travels 45 minutes once a week to visit his girlfriend in Martinsburg, West Virginia [Doc. 20 at 14]. He and his girlfriend also visit the state park in Berkeley Springs to do activities like shooting pool [*Id.*]. Plaintiff testified that he can do his own grocery shopping as well as carry grocery bags into his house and put everything away [*Id.*]. Plaintiff also testified that he carries forty-pound bags of pellets for twenty feet every day and unloads them from his friend's pickup truck every time that he purchases them [*Id.* at 15]. Plaintiff builds wishing wells and lighthouses that he and his girlfriend take to craft fairs, where they load and unload them [*Id.*]. Not only do Plaintiff's daily activities of lifting forty-pound bags of pellets and frequent loading and unloading of eight to ten-pound wishing wells as well as thirty to forty-pound lighthouses contradict Dr. Stalvey's findings on Plaintiff's limitations, but Dr. Stalvey's opinions contradict those of the State agency assessments and his own treatment notes. Given these facts, this Court finds that the ALJ assigned proper weight to the opinions of Plaintiff's treating physician.

### 2. The ALJ Properly Evaluated Plaintiff's Credibility

The determination of whether a person is disabled by pain or other symptoms is a two-step process. **Craig v. Chater**, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 96-7p. WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. **Craig**, 76 F.3d at 594; *see also* **Hines v. Barnhart**, 453 F.3d 559, 565 (4th Cir. 2006). Second, once this threshold determination has been made, the ALJ must consider the credibility of

his subjective allegations of pain in light of the entire record. **Craig**, 76 F.3d at 594; **Hines**, 453 F.3d at 565. Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

At a minimum, the SSA requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by evidence in the case record." SSR 96-7p, 1996 WL 374, 186, at *2. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." **Shively v. Heckler,** 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." **Ryan v. Astrue**, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets her basic duty of explanation, "[w]e will

reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" **Sencindiver v. Astrue**, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (Seibert, MJ.) (quoting **Powers v. Apfel**, 207 F.3d 431, 435 (7th Cir. 2000)).

Neither Plaintiff nor the Commissioner dispute the ALJ's determination that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms" [Doc. 20 at 32]. Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, this Court finds that the ALJ properly assessed the credibility of Plaintiff's testimony about his symptoms. See **Craig**, 76 F.3d at 585. The ALJ explicitly mentions evidence pertaining to Plaintiff's daily activities, which can be found in the R&R [Doc. 20 at 32-33]. Despite Plaintiff's assertion that the ALJ's consideration of his daily activities was insufficient to determine his ability to work, it is this Court's opinion that the ALJ appropriately examined Plaintiff's complaints as related to his daily activities. See 20 C.F.R. §§ 1529(c)(3), 416.929(c)(3); see also **Mastro v. Apfel**, 270 F.3d 171, 179-80 (4th Cir. 2000) (finding that the ALJ properly considered the plaintiff's daily activities in concluding that she could perform past relevant work); **Smith v. Astrue**, 2010 WL 1435661, at *7 (N.D. W. Va. Apr. 24, 2012) (finding "no error in the ALJ's consideration of the plaintiff's daily activities").

The ALJ also discussed treatment that Plaintiff received to relieve his lower back pain. Specifically, the ALJ noted that while Plaintiff "has received treatment for his lower back impairment, that treatment has been essentially routine and/or conservative in nature" [Doc. 20 at 34]. The ALJ further stated that Plaintiff's treatment regimen consisted of "pain medication and steroid injections," and that the record indicated that he had significantly

improved by May 2009 [*Id.*].  Finally, the ALJ noted that Plaintiff's treating physicians have recommended that he proceed with conservative treatment and have noted that "his condition has stabilized accordingly" [*Id.*].  While Plaintiff argues that his treatment, consisting of steroid injections, is hardly conservative treatment, numerous courts in the Fourth Circuit have classified steroid injections as conservative treatment.  *See, e.g.*, ***Doak v. Astrue,*** 2010 WL 1432454, at *3 (E.D.N.C. Apr. 25, 2012); ***French v. Astrue***, 2012 WL1099838, at *1 (W.D. Va. Apr. 2, 2012); ***Martin v. Barnhart***, 2012 WL 663168, at *5 (W.D. Va. Feb. 29, 2012); ***Jones v. Astrue***, 2012 WL 1555901, at *6 (E.D.N.C. Feb. 27, 2012); ***Reel v. Astrue***, 2010 WL 2365667, at *14 (N.D. W. Va. Mar. 2, 2010); *see also* ***Gross v. Heckler***, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").  Accordingly, this Court finds that the ALJ appropriately considered Plaintiff's treatment when determining that Plaintiff was not entirely credible.

The ALJ also discussed medical and non-medical evidence inconsistent with Plaintiff's subjective complaints, which can be found in the R&R [Doc. 20 at 35-36].

In his brief, Plaintiff suggests that he is entitled to an enhanced credibility determination because of his "honorable work history with earnings every year prior to his disability since 1978" [Doc. 17 at 15].  However, Plaintiff's work history does not automatically entitle his subjective complaints to entitled credibility.  *See* ***Jeffries v. Astrue***, 2012 WL 314156, at *25 (S.D. W. Va. Feb. 1, 2012) (noting that the plaintiff relied on cases from outside the Fourth Circuit to support his argument that he was entitled to substantial credibility because of his work history and further noting that the "requirement that the ALJ

make a credibility determination based on these factors would be meaningless if a long work history *standing alone* established 'substantial credibility'"). Furthermore, Plaintiff cites ***Bjornson v. Astrue***, 671 F.3d 640, 645-46 (7th Cir. 2012) for the proposition that the ALJ's "boilerplate" language in her credibility determination is insufficient [Doc. 17 at 14]. However, as discussed above, the ALJ provided reasons for discrediting Plaintiff's complaints and cited the evidence to support this determination. Although the ALJ may have used a "template" to draft her decision, the substance of the decision itself supports the credibility determination. *See **Smith***, 2012 WL 1435661, at *6 (noting that the ALJ's findings could not be classified as "boilerplate language" because the ALJ spent three pages discussing evidence supporting his credibility finding).

After considering the evidence, the ALJ correctly determined that Plaintiff's complaints are not credible in light of the medical evidence, treatment received by Plaintiff, and his daily activities [Doc. 20 at 27]. Specifically, the ALJ noted that Plaintiff's "ability to participate in such activities undermines his credibility regarding the severity of the disabling functional limitations alleged" [*Id.*]. Furthermore, Plaintiff's work history did not automatically entitle him to a finding of enhanced credibility by the ALJ. *See **Jeffries***, 2012 WL 314156, at *25. Because the ALJ adequately supported her credibility determination with evidence from Plaintiff's own statements, as well as objective findings from the record, this Court finds that substantial evidence exists to support the ALJ's credibility determination.

### 3. The ALJ Properly Relied Upon the Opinion of Henry Scovern, M.D.

This Court finds that Plaintiff's objection that the ALJ improperly relied upon the

opinion of medical consultant, Henry Scovern, M.D., because Plaintiff could find no information on his credentials is without merit. Henry Scovern, M.D., is, in fact, a board-certified practicing physician in Pennsylvania [Doc. 23 at 1-2]. Accordingly, this Court finds the ALJ properly relied on Dr. Scovern's assessment to the extent that is supported a finding that Plaintiff was not disabled.

## IV. CONCLUSION

For the foregoing reasons, this Court **ADOPTS** the magistrate judge's Report and Recommendation [Doc. 20]. Specifically, this Court finds that the Commissioner's decision to deny the Plaintiff's applications for disability insurance benefits and supplemental security income was supported by substantial evidence and should be affirmed as a matter of law.

Accordingly, Plaintiff's Motion for Summary Judgment [Doc. 16] is **DENIED**, and the Commissioner's Motion for Summary Judgment [Doc.18] should be **GRANTED**, **AFFIRMING** the Commissioner's decision in this matter. As a final matter, Plaintiff's Objections [Doc. 21] are **OVERRULED**. Accordingly, the Court hereby **ORDERS** that this matter be **STRICKEN** from the active docket of this Court.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: July 26, 2012

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE